O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LINDA GOMEZ,                         ) Case No. EDCV 12-0925-JPR
                                     )
                  Plaintiff,         )
                                     )
          vs.                        ) MEMORANDUM OPINION AND ORDER
                                     ) AFFIRMING THE COMMISSIONER
CAROLYN W. COLVIN, Acting            )
Commissioner of Social               )
Security,[1]                         )
                                     )
                  Defendant.         )
                                     )

I.    **PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision

denying her application for Social Security Supplemental Security

Income benefits ("SSI") and "Disabled Adult Child" benefits

("DAC").[2]  The parties consented to the jurisdiction of the

---

     [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

     [2]    DAC benefits are available for a disabled child of a
person who is deceased or drawing Social Security disability or
retirement benefits.  See 42 U.S.C. § 402(d).  To be eligible for
DAC benefits, the applicant must have become disabled before age
22.  See id.

1

undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed February 21, 2013, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.  BACKGROUND**

Plaintiff was born on February 27, 1976.  (Administrative Record ("AR") 127.)  She has a 12th-grade education.  (AR 35, 174.)  In 1999 Plaintiff worked for approximately two and a half months as a "newspaper jogger," stacking newspapers and inserting them into a machine.  (AR 31, 65, 170, 197, 199.)  She left that job when she became pregnant.  (AR 60.)  She last worked as a grocery-store clerk for one day in 2006.  (AR 31, 170, 197.)

On May 8, 2009, Plaintiff filed applications for SSI and DAC based on the earnings record of her father.  (AR 127-28, 160-63, 176.)  Plaintiff alleged that she had been unable to work since January 1, 1995, because of bipolar disorder, anxiety, and attention deficit disorder.  (AR 169.)  Her applications were denied initially, on June 24, 2009 (AR 77-85), and upon reconsideration, on September 30, 2009 (AR 89-94).

After Plaintiff's applications were denied, she requested a hearing before an ALJ.  (AR 96.)  A hearing was held on October 21, 2010, at which Plaintiff, who was represented by counsel, appeared and testified; a medical expert and a vocational expert ("VE") also testified.  (AR 24-68.)  In a written decision issued December 21, 2010, the ALJ determined that Plaintiff was not disabled.  (AR 9-20.)  On April 18, 2012, the Appeals Council

denied Plaintiff's request for review.  (AR 1-3.)  This action
followed.

**III.  STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review
the Commissioner's decision to deny benefits.  The ALJ's findings
and decision should be upheld if they are free of legal error and
supported by substantial evidence based on the record as a whole.
§ 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.
1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d
742, 746 (9th Cir. 2007).  Substantial evidence means such
evidence as a reasonable person might accept as adequate to
support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter
v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than
a scintilla but less than a preponderance.  Lingenfelter, 504
F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,
882 (9th Cir. 2006)).  To determine whether substantial evidence
supports a finding, the reviewing court "must review the
administrative record as a whole, weighing both the evidence that
supports and the evidence that detracts from the Commissioner's
conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.
1996).  "If the evidence can reasonably support either affirming
or reversing," the reviewing court "may not substitute its
judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or which has lasted, or is expected

3

1  to last, for a continuous period of at least 12 months.  42

2  U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

3  (9th Cir. 1992).

4       Under Title II of the Social Security Act, a disabled adult

5  whose parent is entitled to Social Security disability insurance

6  benefits may receive DAC benefits if she can show, among other

7  things, that at the time of filing for DAC benefits she was

8  unmarried, dependent on the wage-earning parent, and "under a

9  disability . . . [that] began before [s]he attained the age of

10  22." 42 U.S.C. § 402(d)(1)(B); 20 C.F.R. § 404.350.  To be

11  eligible for benefits, the claimant "must be disabled

12  continuously and without interruption beginning before her

13  twenty-second birthday until the time she applied for child's

14  disability insurance benefits." Smolen v. Chater, 80 F.3d 1273,

15  1280 (9th Cir. 1996) (emphasis in original).

16       A.   The Five-Step Evaluation Process

17       The ALJ follows a five-step sequential evaluation process in

18  assessing whether a claimant is disabled.  20 C.F.R.

19  §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821,

20  828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).[3]  In the first

21  step, the Commissioner must determine whether the claimant is

22  currently engaged in substantial gainful activity; if so, the

23  claimant is not disabled and the claim must be denied.

24  §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not

25

26       [3]   In evaluating a claimant's eligibility for DAC
   benefits, the ALJ uses the same five-step process as used to
27  evaluate eligibility for a claimant's own disability insurance
   benefits under Title II of the Social Security Act.  See 42
28  U.S.C. §§ 401 et seq.; 20 C.F.R. §§ 404.301, 404.1520.

4

engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform her past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled

---

    [4]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  because she can perform other substantial gainful work available

2  in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

3  That determination comprises the fifth and final step in the

4  sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at

5  828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

6       To establish eligibility for DAC benefits, the Commissioner

7  must also find that the claimant is the child of the insured, is

8  dependent on the insured, is unmarried, and has a disability that

9  began before age 22.  20 C.F.R. § 404.350(a).

10      B.   <u>The ALJ's Application of the Five-Step Process</u>

11      At step one, the ALJ found that Plaintiff had not turned 22

12 as of January 1, 1995, the alleged onset date, and had not

13 engaged in substantial gainful activity since that date.  (AR

14 11.)  She found that the limited work Plaintiff performed in 1999

15 and 2006 "did not rise to the level of substantial gainful

16 activity."  (<u>Id.</u>)  At step two, the ALJ concluded that Plaintiff

17 had the severe impairments of "bipolar disorder, not otherwise

18 specified; attention deficit disorder; and a history of substance

19 abuse."  (AR 12.)  At step three, the ALJ determined that

20 Plaintiff's impairments did not meet or equal any of the

21 impairments in the Listing.  (AR 12-13.)  At step four, the ALJ

22 found that Plaintiff retained the RFC to perform "a full range of

23 work at all exertional levels" but was "limited to simple,

24 repetitive tasks" and "no interaction with the public and only

25 non-intense contact with coworkers and supervisors"; she was also

26 "precluded from positions requiring hypervigilence, fast-paced

27 work or responsibility for the safety of others."  (AR 13.)

28 Based on the VE's testimony, the ALJ concluded that Plaintiff was

1  "capable of performing past relevant work as a newspaper jogger

2  as she actually performed it" but "not as generally performed

3  based on the testimony of the [VE]." (AR 19.)   The ALJ therefore

4  concluded that with respect to her application for DAC, Plaintiff

5  was not disabled as defined in § 223(d) of the Social Security

6  Act, 42 U.S.C. § 423(d), prior to attaining age 22.[5]   (Id.)   With

7  respect to her application for SSI, the ALJ determined that

8  Plaintiff was not disabled under § 1614(a)(3)(A) of the Social

9  Security Act, 42 U.S.C. § 1382c(a)(3)(A).   (Id.)

10  **V.   DISCUSSION**

11      Plaintiff alleges that the ALJ erred in (1) evaluating the

12  opinion of her treating physician; (2) failing to address an

13  inconsistency between Plaintiff's RFC and the Dictionary of

14  Occupational Titles ("DOT"); and (3) evaluating the Third Party

15  Disability Report completed by Plaintiff's mother. (J. Stip. at

16  2-3.)

17      A.   The ALJ Did Not Err in Evaluating the Opinion of

18          Plaintiff's Treating Physician

19      Plaintiff first contends that the ALJ erred in evaluating

20  the opinion of her treating physician, psychiatrist Dr. Ochuko

21  Gregson Diamreyan. (J. Stip. at 3-5.)   Reversal is not warranted

22  on this basis because the ALJ gave specific and legitimate

23  reasons for rejecting Dr. Diamreyan's opinion and those reasons

24

25      [5]   The ALJ did not make specific findings as to the other

26  factors enumerated in § 404.350(a). (See AR 11-19.)   The record
    showed, however, that Plaintiff was the child of Anthony Paul

27  Gomez, who was eligible to receive DIB (AR 164-65, 176), she was
    likely his dependent (AR 161), and she was unmarried (AR 30, 32,

28  160).

1 were supported by substantial evidence in the record.

2      1.  Applicable law

3     Three types of physicians may offer opinions in social
4 security cases: "(1) those who treat[ed] the claimant (treating
5 physicians); (2) those who examine[d] but d[id] not treat the
6 claimant (examining physicians); and (3) those who neither
7 examine[d] nor treat[ed] the claimant (non-examining
8 physicians)." Lester, 81 F.3d at 830.  A treating physician's
9 opinion is generally entitled to more weight than the opinion of
10 a doctor who examined but did not treat the claimant, and an
11 examining physician's opinion is generally entitled to more
12 weight than that of a nonexamining physician.  Id.

13     The opinions of treating physicians are generally afforded
14 more weight than the opinions of nontreating physicians because
15 treating physicians are employed to cure and have a greater
16 opportunity to know and observe the claimant.  Smolen, 80 F.3d at
17 1285.  If a treating physician's opinion is well supported by
18 medically acceptable clinical and laboratory diagnostic
19 techniques and is not inconsistent with the other substantial
20 evidence in the record, it should be given controlling weight.
21 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  If a treating
22 physician's opinion is not given controlling weight, its weight
23 is determined by length of the treatment relationship, frequency
24 of examination, nature and extent of the treatment relationship,
25 amount of evidence supporting the opinion, consistency with the
26 record as a whole, the doctor's area of specialization, and other
27 factors.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

28     When a treating or examining doctor's opinion is not

8

1  contradicted by another doctor, it may be rejected only for

2  "clear and convincing" reasons.  <u>Carmickle v. Comm'r, Soc. Sec.</u>

3  <u>Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81

4  F.3d at 830-31).  When a treating or examining physician's

5  opinion conflicts with another doctor's, the ALJ must provide

6  only "specific and legitimate reasons" for discounting the

7  treating doctor's opinion.  <u>Id.</u>  Further, the ALJ "need not

8  accept the opinion of any physician, including a treating

9  physician, if that opinion is brief, conclusory, and inadequately

10 supported by clinical findings."  <u>Thomas v. Barnhart</u>, 278 F.3d

11 947, 957 (9th Cir. 2002); <u>accord</u> <u>Batson v. Comm'r of Soc. Sec.</u>

12 <u>Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).  The weight given an

13 examining physician's opinion, moreover, depends on whether it is

14 consistent with the record and accompanied by adequate

15 explanation, among other things.  20 C.F.R. §§ 404.1527(c)(3)-

16 (6), 416.927(c)(3)-(6).

17             2.   <u>Relevant facts</u>

18    On May 7, 2009, apparently the first day he saw Plaintiff,

19 Dr. Diamreyan signed a handwritten note stating only,

20         The above named is very sick.  She is not well

21         enough to hold a job.

22 (AR 289.)  He also performed an "initial psychiatric evaluation"

23 of Plaintiff on that date, in which he noted that Plaintiff had

24 been recently hospitalized pursuant to a 5150 admission[6] and that

25

26         [6]   California Welfare and Institutions Code section 5150
   provides:

27

28         When any person, as a result of mental disorder, is a
           danger to others, or to himself or herself, or gravely

9

she had a history of methamphetamine use, petty theft, and battery on her domestic partner. (AR 280; see also AR 243-53 (Apr. 2009 hospitalization records), AR 272 (noting history of domestic battery).) He noted that she was "anxious" and had "vocal tics," but her general appearance was "clean," her mood was "euthymic," her speech, perception, thought process, thought control, and cognitive functions were all "intact," and her impulse control, judgment, insight, and reliability were "fair." (AR 280.) He diagnosed her with bipolar disorder, assessed a Global Assessment of Functioning ("GAF") score of 40,[7] and prescribed antidepressants. (AR 281.) His prognosis was "guarded." (Id.)

On May 14, 2009, Dr. Diamreyan saw Plaintiff again and noted that she had stopped taking the medication he prescribed after one day and showed signs of "anxiety" and "depression," but her appearance was "appropriate"; she was "cooperative," made eye contact, and was "interactive"; and she did not show any

disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Social Services as a facility for 72-hour treatment and evaluation.

[7]    A GAF score of 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

psychomotor agitation or retardation, elation, inappropriate
affect, lack of impulse control, delusions, hallucinations,
suicidal or homicidal ideation, or impaired orientation, memory,
or judgment.  (AR 279.)  He prescribed Prozac and set a follow-up
appointment.  (Id.)  On May 26, June 25, and July 24, 2009, Dr.
Diamreyan noted similarly that Plaintiff appeared anxious and
depressed but did not have any other signs of impaired mental
functioning, and he continued to adjust her medication dosages.
(AR 276-78.)  On July 6, 2009, Dr. Diamreyan signed a note
stating that Plaintiff "is my patient with a diagnosis of Bipolar
[disorder], Tourette (vocal tics)," problems with impulse
control, and kleptomania.  (AR 289.)  He noted that Plaintiff "is
on Prozac and Lamictal [and] I see her every 2 weeks for
medication [management]."  (Id.)  On August 14, 2009, Dr.
Diamreyan noted that "Prozac makes [Plaintiff have] worse mood
swings," and Plaintiff reported that her "husband"[8] kicked her
out of the house and suspected that she was using methamphetamine
again.  (AR 275.)  Dr. Diamreyan noted that she appeared anxious
and depressed and had "lack of impulse control," but she did not
show any other signs of impaired mental functioning.  (Id.)  He
discontinued Prozac and prescribed a different medication.  (Id.)
On September 18, 2009, Dr. Diamreyan noted that Plaintiff was
still having mood swings, "keeps giving excuses" for not
following up with further testing, said her "family suspects
she's doing drugs again," seemed "impulsive" and "restless," and

---

[8]    Plaintiff was not in fact married but lived with her
boyfriend, who was the father of her two children.  (See AR 30,
32.)

11

had missed her last appointment.  (AR 274.)  He noted that she appeared anxious and depressed but did not show any other signs of impaired mental functioning.  (Id.)  He again adjusted her medication dosages.  (Id.)  On October 2, 2009, Dr. Diamreyan noted that Plaintiff was "doing well" but missed her children[9] and had "some mood swings."  (AR 273.)  He again noted that she appeared anxious and depressed but did not show any other signs of impaired mental functioning.  (Id.)  He adjusted her medication.  (Id.)  On March 1, 2010, Dr. Diamreyan saw Plaintiff again and noted that Plaintiff had stopped taking her medications because she was "concerned about weight gain"; he did not make any notes about her mental status but did prescribe new medication.  (AR 309.)

     3.  <u>Analysis</u>

After thoroughly summarizing the medical evidence of record, the ALJ discussed Dr. Diamreyan's opinion that Plaintiff was unable to work:

> The undersigned has read and considered the disability statement written by Dr. Ochuko Diamreyan dated May 7, 2009.  Dr. Diamreyean opined the claimant was too sick to work.  Dr. Diamreyan did not document positive objective clinical or diagnostic findings to support this statement and it appears the doctor largely adopted the claimant's own reported symptomatology.  Dr. Diamreyan's own clinical findings on this same date

---

[9]  Plaintiff's children were removed from her home in August 2009 and not returned until October 2010.  (<u>See</u> AR 55-56, 291-99.)

1   revealed essentially unremarkable findings, including
2   intact memory, attention, concentration and fair judgment
3   and insight. Furthermore, the undersigned finds that Dr.
4   Diamreyan only started to have a treating relationship
5   with the claimant at the time he authored this disability
6   statement. One examination would not have provided the
7   doctor enough information to obtain a longitudinal
8   picture of the claimant's medical condition. Thus, the
9   undersigned finds Dr. Diamreyan's conclusion has no
10  probative value and rejects it. As an opinion on an
11  issue reserved to the Commissioner, this statement is not
12  entitled to controlling weight and is not given special
13  significance pursuant to 20 C.F.R. 404.1527(e) and
14  416.927(e).

(AR 18.)

The ALJ gave specific and legitimate reasons for rejecting
Dr. Diamreyan's opinion that Plaintiff was unable to work, and
those reasons were supported by substantial evidence in the
record.[10] First, as the ALJ correctly noted, Dr. Diamreyan's
opinion conflicted with his treatment notes, which showed that
although Plaintiff was anxious and depressed, had a GAF score of
40, had mood swings, was not always compliant with her
medication, and may have continued to use methamphetamine, her
appearance was "appropriate," she was "cooperative," she made eye

---

[10]    Because Dr. Diamreyan's opinion conflicted with his own
treatment notes and the opinions of the medical expert and state-
agency physicians, the ALJ needed to provide only "specific and
legitimate" reasons for rejecting it. See Carmickle, 533 F.3d at
1164.

contact and was "interactive," and she did not show any
psychomotor agitation or retardation, elation, inappropriate
affect, delusions, hallucinations, suicidal or homicidal
ideation, or impaired orientation, memory, or judgment. (AR 273-
81); see Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003)
(treating doctor's opinion properly rejected when treatment notes
"provide no basis for the functional restrictions he opined
should be imposed on [claimant]"); Valentine v. Comm'r, Soc. Sec.
Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (contradiction
between treating physician's opinion and his treatment notes
constitutes specific and legitimate reason for rejecting treating
physician's opinion); Batson, 359 F.3d at 1195 ("an ALJ may
discredit treating physicians' opinions that are conclusory,
brief, and unsupported by the record as a whole . . . or by
objective medical findings"); Rollins v. Massanari, 261 F.3d 853,
856 (9th Cir. 2001) (ALJ permissibly rejected treating
physician's opinion when opinion was contradicted by or
inconsistent with treatment reports).  The ALJ did not ignore Dr.
Diamreyan's findings that Plaintiff suffered from ongoing
anxiety, depression, mood swings, poor impulse control, and
difficulty interacting with others.  She properly accounted for
those symptoms in her RFC finding by limiting Plaintiff to
simple, repetitive tasks and limiting her contact with
supervisors, coworkers, and the public. (AR 13.)  Indeed, she
gave Plaintiff the benefit of the doubt by rejecting the portions
of the opinions of the state-agency physicians opining that
Plaintiff's impairments had not lasted the requisite 12 months to
be considered "severe"; she agreed with those physicians that

14

Plaintiff should be limited to "simple repetitive tasks" but found, "after considering the claimant's bipolar disorder, attention deficit hyperactivity and history of methamphetamine use," that "the evidence supports additional restrictions" on Plaintiff's ability to interact with others.  (AR 18-19, 254-72.) The ALJ's analysis was thus consistent with Dr. Diamreyan's properly supported medical findings.

Second, the ALJ properly rejected Dr. Diamreyan's opinion that Plaintiff could not work because it was rendered on the first day he saw Plaintiff, and thus he had not had "enough information to obtain a longitudinal picture of [Plaintiff's] medical condition" when he rendered it.  (AR 18); see Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (factors in assessing treating physician's opinion include length of treatment relationship, frequency of examination, and nature and extent of treatment relationship); accord 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Notably, after he had spent more time treating her, Dr. Diamreyan never again opined that Plaintiff was unable to work.  (See AR 273-81, 309.)

Third, to the extent Dr. Diamreyan's opinion was premised on Plaintiff's discredited subjective statements – the rejection of which Plaintiff does not contest – the ALJ also properly rejected it.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (when ALJ properly discounted claimant's credibility, he was "free to disregard" doctor's opinion that was premised on claimant's subjective complaints); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (when physician's opinion of disability premised "to a large extent" upon

1   claimant's own accounts of symptoms, limitations may be
2   disregarded if complaints have been "properly discounted");
3   Houghton v. Comm'r of Soc. Sec. Admin., 493 F. App'x 843, 845
4   (9th Cir. 2012) (ALJ's finding that doctors' opinions were
5   "internally inconsistent, unsupported by their own treatment
6   records or clinical findings, inconsistent with the record as a
7   whole, and premised primarily on [claimant's] subjective
8   statements which the ALJ found unreliable" constituted specific
9   and legitimate bases for discounting them).  Dr. Diamreyan
10  clearly relied at least in part on Plaintiff's subjective
11  symptoms because his May 7, 2010 notes reveal few abnormal
12  clinical findings but extensively document her subjective
13  statements.  (See AR 280-87.)
14      Fourth, the ALJ was entitled to reject Dr. Diamreyan's
15  opinion that Plaintiff was unable to work because it was a legal
16  conclusion rather than a medical opinion and thus was not
17  entitled to deference.  (AR 18); see 20 C.F.R. § 416.945(e); SSR
18  96-5p, 1996 WL 374183, at *5 (Commissioner must make ultimate
19  disability determination; opinions from medical sources about
20  whether a claimant is "disabled" or "unable to work" "can never
21  be entitled to controlling weight or given special
22  significance"); McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir.
23  2011) (noting that "a treating physician ordinarily does not
24  consult a vocational expert or have the expertise of one";
25  treating physician's evaluation of claimant's ability to work
26  thus not entitled to deference because "[t]he law reserves the
27  disability determination to the Commissioner").
28      Finally, to the extent the ALJ rejected Dr. Diamreyan's

16

opinion in favor of the opinion of testifying medical expert Dr.
David Glassmire, she was entitled to do so.  Dr. Glassmire's
opinion was consistent with the objective evidence.  (AR 18); see
Thomas, 278 F.3d at 957 ("The opinions of non-treating or
non-examining physicians may also serve as substantial evidence
when the opinions are consistent with independent clinical
findings or other evidence in the record."); Morgan, 169 F.3d at
600 ("Opinions of a nonexamining, testifying medical advisor may
serve as substantial evidence when they are supported by other
evidence in the record and are consistent with it" (citing
Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995))); see 20
C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (ALJ will generally give
more weight to opinions that are "more consistent . . . with the
record as a whole").  For example, Dr. Glassmire noted that
Plaintiff had been diagnosed with bipolar disorder and attention
deficit hyperactivity disorder and also had a history of
methamphetamine abuse, mood swings, and explosive personality,
but her mental status examinations in 2009 by Dr. Diamreyan and
in May and June 2010 by Dr. Salvador Lasala were "generally
normal."  (AR 48-54, 273-83, 301-07, 309.)  He also noted that
although Plaintiff was assessed low GAF scores by Dr. Diamreyan,
Dr. James Pace, who evaluated Plaintiff in connection with issues
over custody of her children, and Dr. Lasala (see AR 281 (GAF
score of 40), 298 (GAF score of 40), 306 (GAF score of 47)[11]),

_____

[11]   A GAF score of 47 indicates "serious symptoms ([e.g.]
suicidal ideation . . .) OR any serious impairment in social,
occupational or school functioning."  See Am. Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.
2000).

those scores were not consistent with the evaluations of Plaintiff's behavior in those same reports, showing that Plaintiff's cognitive functioning was largely intact and her behavior was mostly normal (see AR 55, 273-83, 291-99, 301-07, 309).[12]  Moreover, Dr. Glassmire, unlike Dr. Diamreyan, reviewed all the medical evidence up to the date of the hearing before rendering his opinion.  (AR 114-15); see 20 C.F.R. §§ 404.1527(c)(6) (extent to which doctor is "familiar with the other information in [claimant's] case record" is relevant factor in determining weight given to opinion), 416.927(c)(6) (same). The ALJ could also credit Dr. Glassmire's opinion because he

---

[12]     The ALJ made a similar finding, which Plaintiff does not directly challenge:

> The undersigned has read and considered the GAF scores throughout the claimant's medical record.  The undersigned finds GAF scores in general are of limited evidentiary value.  These subjectively assessed scores reveal only snapshots of impaired and/or improved behavior.  The undersigned gives more weight to the objective details and chronology of the record, which more accurately describe the claimant's impairments and limitations.  In this instance, the claimant was given low GAF scores after precipitating events such as drug misuse requiring hospitalization and having her children taken away through child protective services.  Despite relatively unremarkable mental status examinations, the claimant's treating physicians continued to assess low GAF scores.  The undersigned finds these GAF scores are not a true reflection of the claimant's overall function based on the totality of the medical evidence [and] the claimant's actual functional level including her own statements regarding daily living activities.

(AR 17-18 (citations omitted).)

testified at the hearing, heard most of Plaintiff's testimony,[13]
and was subject to cross-examination.  See Andrews, 53 F.3d at
1042 (greater weight may be given to nonexamining doctors who are
subject to cross-examination).  Any conflict in the properly
supported medical-opinion evidence was the sole province of the
ALJ to resolve.  See id. at 1041.

Plaintiff is not entitled to remand on this ground.

B.   The ALJ's Finding that Plaintiff Was Capable of
     Performing Her Past Relevant Work Did Not Conflict with
     the DOT

Plaintiff argues that the ALJ erred in determining that
Plaintiff was capable of performing her past relevant work as a
newspaper jogger because the DOT description most applicable to
that job was inconsistent with the ALJ's RFC finding.  (J. Stip.
at 8-11.)  No inconsistency existed, and thus reversal is not
warranted on this basis.

1.   Applicable law

When a VE provides evidence about the requirements of a job,
the ALJ has a responsibility to ask about "any possible conflict"
between that evidence and the DOT.  See SSR 00-4p, 2000 WL
1898704, at *4; Massachi v. Astrue, 486 F.3d 1149, 1152-54 (9th
Cir. 2007) (holding that application of SSR 00-4p is mandatory).
An ALJ's failure to do so is procedural error, but the error is
harmless if no actual conflict existed or the VE provided
sufficient evidence to support the conclusion.  Massachi, 486

---

[13]   Dr. Glassmire was wanted in another proceeding and left
before Plaintiff had completely finished testifying.  (AR 46,
55.)

1   F.3d at 1154 n.19.

2        2.   Relevant facts

3        At the hearing Plaintiff testified that she worked at the

4   Press Enterprise newspaper as a newspaper jogger for

5   approximately two and a half months in 1999; her job was "pretty

6   routine[]" and involved "stacking the papers [and] inserting them

7   in a machine." (AR 31.) She described the job similarly in her

8   May 13, 2009 Work History Report as "insert jogger – put the

9   newspaper into the machine as it went around," and checked boxes

10  indicating that she used machines, tools, or equipment but did

11  not use technical knowledge or skills, do any writing or

12  completing of reports, or supervise others. (AR 199.) Plaintiff

13  quit the job when she became pregnant. (AR 60.)

14       Regarding Plaintiff's RFC, Dr. Glassmire testified that

15  Plaintiff should be limited to "simple, repetitive tasks; no

16  interaction with the public; only non-intense interactions with

17  co-workers and supervisors; no tasks requiring hypervigilence; no

18  fast paced work; and I would not have her responsible for the

19  safety of others." (AR 52.) The VE then took the stand and

20  testified that the only one of Plaintiff's past jobs that

21  potentially rose to the level of past relevant work was the

22  "newspaper jogger" position. (AR 65.) The VE testified that

23  there was no specific DOT code for a newspaper jogger, but the

24  job likely fell under the title of print-shop helper, DOT

25  979.684-026, 1991 WL 688686. (Id.) He noted that the job as

26  described in the DOT required a Specific Vocational Preparation

27  ("SVP") level of "3, semi-skilled and medium," but as it was

28  actually performed was "at an SVP: 2," indicating unskilled work.

1  (Id.); see SSR 00-4p, 2000 WL 1898704, at *3.  In keeping with

2  Dr. Glassmire's RFC assessment, the ALJ then questioned the VE as

3  follows:

4      Q.   Okay.  If we assume a hypothetical person who is 18

5           years old, has a 12th grade education, is literate,

6           speaks English and can perform the demands of work

7           within the following RFC: there are no exertional

8           limitations,   but   she's   limited   to   simple,

9           repetitive tasks; no interaction with the public

10          and only non-intense contact with co-workers and

11          supervisors; no jobs requiring hypervigilence; no

12          fast paced work; and no responsibility for the

13          safety of others.  Would this person be able to do

14          her past relevant work?

15     A.   I believe so, yes.

16     Q.   Okay.  Both as performed and per the DOT?

17     A.   Yes, Your Honor.

18  (AR 66.)

19      The DOT provides the following description of the print-shop

20  helper job:

21      Assists workers engaged in setting type, operating

22      printing presses, and making plates, performing any

23      combination of following duties: Moves material and

24      supplies to and from various work areas.  Assists in

25      making ready and adjusting presses for production runs.

26      Keeps presses supplied with paper stock.  Cleans presses,

27      printing plates, and type setups after use.  Covers

28      dampening rolls with wool or felt.  Counts, stacks, and

21

wraps finished printed material. Cleans electrotype
shells prior to casting, and removes excess metal from
edges or backs of cast printing plates, using metal
trimming and shaving machines. Trims stereotype matrices
to size and dries them between steam or flame-heated
plates. Immerses cast plates in copper and chrome
plating solutions. Nails wooden blocks to backs of
prepared plates to bring plates to printing level. May
set type by hand following copy. May be designated
according to work involved as Electrotyper Helper (print.
& pub.); Photoengraving Helper (print. & pub.);
Stereotyper Helper (print. & pub.). Performs other
duties as described under HELPER (any industry) Master
Title.

DOT 979.684-026, 1991 WL 688686.

     3.  <u>Analysis</u>

The ALJ found that Plaintiff had the RFC to perform "a full
range of work at all exertional levels," was "limited to simple,
repetitive tasks" and "no interaction with the public and only
non-intense contact with coworkers and supervisors," and was
"precluded from positions requiring hypervigilence, fast-paced
work or responsibility for the safety of others." (AR 13.) She
then made the following findings regarding Plaintiff's ability to
perform the work of newspaper jogger:

The claimant is capable of performing past relevant
work as a newspaper jogger as she actually performed it.
This work does not require the performance of work
related activities precluded by the claimant's residual

functional capacity.

The vocational expert reviewed the claimant's vocational file prior to the hearing. The vocational expert was present to hear the claimant's testimony and to ask questions. Based on the claimant's limitations as stated herein, the vocational expert testified that the claimant would be able to do her past work as a newspaper jogger as she actually performed it and not as generally performed in the economy.[14]

The vocational expert described the claimant's past relevant work as newspaper jogger, and that she performed it at a light unskilled job.

The vocational expert stated that the DOT described the claimant's past work as a print shop helper, DOT 979-687.026, medium, semiskilled (SVP 3) occupation.

The testimony of the vocational expert is consistent with the DOT, and the undersigned accepts it. In comparing the claimant's residual functional capacity with the physical and mental demands of work as a newspaper jogger, the undersigned has determined the claimant is able to perform this past relevant occupation

---

[14]   The ALJ erred in stating that the VE found that Plaintiff could not perform the print-shop helper job as it was generally performed: the VE testified that Plaintiff could perform the job as actually and generally performed. (See AR 66.) Because the ALJ's conclusion that Plaintiff could perform the job as actually performed was supported by substantial evidence, however, the error was harmless and does not require reversal. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

1    as actually performed but not as generally performed
2    based on the testimony of the vocational expert.
3    (AR 19 (citations and footnotes omitted).)

4        Plaintiff is not entitled to reversal on this claim.
5    Plaintiff argues that the ALJ's RFC finding that Plaintiff was
6    limited to simple, repetitive tasks and minimal interaction with
7    coworkers and supervisors conflicts with the DOT description of
8    print-shop helper, which requires performing "a large variety of
9    detailed tasks" and "assist[ing] workers engaged in setting type,
10   operating printing presses, and making plates . . . ." (J. Stip.
11   at 11.) But the ALJ specifically found that Plaintiff could not
12   perform the job as it was generally performed, as described in
13   the DOT. (AR 19); see SSR 00-4p, 2000 WL 1898704, at *3 (DOT
14   "lists maximum requirements of occupations as generally
15   performed, not the range of requirements of a particular job as
16   it is performed in specific settings"). Instead, the ALJ found
17   that Plaintiff could perform the job only as it had actually been
18   performed by Plaintiff. (See AR 19.) Plaintiff testified that
19   the job as she actually performed it was "pretty routine,"
20   consisting of stacking newspapers and inserting them into a
21   machine, and did not involve supervising or interacting
22   extensively with others. (See AR 31, 199.) Plaintiff's RFC
23   limiting her to simple, repetitive tasks and little interaction
24   with others was thus consistent with her description of the
25   newspaper-jogger position as she actually performed it.

26       The VE's testimony also supports the ALJ's decision. The VE
27   testified that as actually performed, the work was an SVP level
28   of 2, which indicates unskilled work. See SSR 00-4p, 2000 WL

24

1898704, at *3.   Unskilled work "needs little or no judgment to
do simple duties that can be learned on the job in a short period
of time."   20 C.F.R. §§ 404.1568(a), 416.968(a).   A person
limited to the performance of simple, repetitive tasks can do
unskilled work.   See Stubbs-Danielson v. Astrue, 539 F.3d 1169,
1173-74 (9th Cir. 2008) (finding that ALJ did not err in holding
that claimant limited to performing "simple, routine, repetitive
sedentary work" could perform "unskilled" jobs).

No conflict existed between the ALJ's RFC finding and her
determination that Plaintiff could perform the job of newspaper
jogger as Plaintiff had actually performed it.   Reversal is
therefore not warranted on this basis.   See Giordano v. Astrue,
304 F. App'x 507, 509 (9th Cir. 2008) ("It was also reasonable
for the ALJ to conclude that [claimant] could return to her past
relevant work, given that [claimant's] own description of her
past jobs accommodated all of the limitations.").

C.   The ALJ Did Not Err in Evaluating the Third-Party
Report of Plaintiff's Mother

Plaintiff lastly contends that the ALJ erred in evaluating
the third-party report submitted by her mother, Evelyn Gomez.
(J. Stip. at 13-16.)   Reversal is not warranted on this basis.

1.   Applicable law

"In determining whether a claimant is disabled, an ALJ must
consider lay witness testimony concerning a claimant's ability to
work."   Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009)
(quoting Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1053
(9th Cir. 2006) (internal quotation marks omitted)); see also 20
C.F.R. § 404.1513(d) (statements from therapists, family, and

25

friends can be used to show severity of impairment(s) and effect
on ability to work), § 416.913(d) (same).  Such testimony is
competent evidence and "cannot be disregarded without comment."
Bruce, 557 F.3d at 1115 (quoting Nguyen v. Chater, 100 F.3d 1462,
1467 (9th Cir. 1996) (internal quotation marks omitted));
Robbins, 466 F.3d at 885 ("[T]he ALJ is required to account for
all lay witness testimony in the discussion of his or her
findings.").  When rejecting the testimony of a lay witness, an
ALJ must give specific reasons that are germane to that witness.
Bruce, 557 F.3d at 1115; see also Stout, 454 F.3d at 1054;
Nguyen, 100 F.3d at 1467.

     If an ALJ fails to discuss competent lay testimony favorable
to the claimant, "a reviewing court cannot consider the error
harmless unless it can confidently conclude that no reasonable
ALJ, when fully crediting the testimony, could have reached a
different disability determination."  Stout, 454 F.3d at 1056;
see also Robbins, 466 F.3d at 885.  But "an ALJ's failure to
comment upon lay witness testimony is harmless where 'the same
evidence that the ALJ referred to in discrediting [the
claimant's] claims also discredits [the lay witness's] claims.'"
Molina v. Astrue, 674 F.3d 1104, 1122 (9th Cir. 2012) (quoting
Buckner v. Astrue, 646 F.3d 549, 560 (8th Cir. 2011)).

          2.   Relevant facts

     On May 15, 2009, Evelyn Gomez filled out a Third Party
Function Report.  (AR 180-87.)  She noted that Plaintiff lived in
a house with her boyfriend and children, spent time with Gomez on
weekends, and spoke to her on the phone daily.  (AR 180.)  She
claimed that Plaintiff "stays inside most of [the] time" and

"[o]rganizes [her] house excessively"; cared for her children "half of the time" with her boyfriend's help; needed to be reminded to bathe regularly; did not prepare meals; was able to clean and do chores around the house, though she needed to be told to do so by her boyfriend; was able to go grocery shopping "once a week for about an hour"; was able to drive a car; and was able to pay bills and count change but did not have any bank accounts.  (AR 180-84.)  She stated that Plaintiff was "hard to get along [with] before her medicine" and that Plaintiff's condition affected her talking, memory, concentration, and ability to complete tasks, follow instructions, and get along with others.  (AR 185.)  She noted that Plaintiff "has a very short attention span" and had difficulty following instructions but "can sometimes follow spoken instructions."  (<u>Id.</u>)  She also stated that Plaintiff did not "respect authority"; reacted to stress by becoming nervous and anxious and getting headaches; and was "very recluusive [sic]."  (AR 185-86.)  She concluded by stating, "I don't think Linda is capable of working right now" because "[s]he needs some help."  (AR 187.)  Gomez did not testify at the hearing.  (<u>See</u> AR 24-68.)

        3.  <u>Analysis</u>

    The ALJ addressed Gomez's report in her written opinion as follows:

> The undersigned has read and considered the *Third Party Function Report* completed by the claimant's mother, Evelyn Gomez on May 15, 2009.  The Claimant's mother reported seeing the claimant on weekends and having daily telephone conversations with the claimant.  The

27

claimant's mother stated the claimant was able to care for her children half the time with help from the claimant's boyfriend.  The claimant's mother reported the claimant was able to clean, go to the store and purchase food for the family.  The claimant's mother opined the claimant was not capable of working.

While a layperson can offer an opinion on a diagnosis, the severity of the claimant's symptoms in relationship to the claimant's ability to work, the opinion of a layperson is far less persuasive on those same issues than are the opinions of medical professionals as relied herein.  In addition, the opinion of the claimant's mother is not an unbiased one because she has a motherly motivation to support the claimant.  More importantly, the clinical or diagnostic medical evidence that is discussed elsewhere in this decision does not support her statements.  The undersigned find [sic] the statement [sic] of the claimant's mother are not credible to the extent her statements are inconsistent with the residual functional capacity assessment herein.

(AR 15 (citations omitted).)

The ALJ did not err in evaluating Gomez's report.  The ALJ gave specific reasons supporting her evaluation of Gomez's report and those reasons were supported by substantial evidence.  To the extent Gomez's statements conflicted with the medical evidence, the ALJ was entitled to reject them.  (AR 15); see Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("[i]nconsistency

28

with medical evidence" is "germane reason[] for discrediting the testimony of lay witnesses").  Moreover, the ALJ found Plaintiff's own statements not credible, a finding Plaintiff does not challenge.  (AR 14-15.)  Gomez's statements were nearly identical to Plaintiff's.  (Compare AR 180-87 with AR 189-96.) For that reason, to the extent the ALJ erred in not providing further support for her rejection of Gomez's statements, any error was harmless.  See Molina, 674 F.3d at 1122.  Although the fact that Gomez was Plaintiff's mother and had a "motherly motivation to support the claimant" (AR 15) was not a valid reason for rejecting Gomez's testimony, see Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."), the remainder of the ALJ's reasons for rejecting Gomez's testimony were supported by substantial evidence, and the error was therefore harmless. See Stout, 454 F.3d at 1056.  Reversal is not warranted on this basis.

**VI.  CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: March 28, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[15]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."